L.A. Reed Music at Al. I will just say in advance to all of our Council, when you do come up, please take a minute. There's a black switch on the right side of the lectern that raises and lowers the whole podium. So please feel free to take a minute and get settled in when you come up for argument. We want to make sure we don't miss a word. And we're also streaming it, so we want to make sure that the microphone picks it all up, too. So don't hesitate to take a minute. That may be as high as it gets. But our trustee CSO will help you. There we go. I think we're ready to go. So, Mr. Farside, I understand you would like to reserve two minutes for rebuttal. Is that right? That's correct, Your Honor. Okay. Please proceed. Good morning, and may it please the Court. Joseph Farside for Appellant Juan Catala doing business. I'm sorry. Slightly louder would help me. Sure. Joseph Farside for Appellant Juan Catala doing business as Magic Entertainment, LLC. Your Honors, Appellee Shin has hidden or minimized his share of songs in breach of Contracts 1, 2, and 3, which are described in our briefs. Shin convinced the District Court, the Honorable District Court, that this dispute is about the delivery of songs and not about the breach of the duty to convey the 50 percent ownership interest in songs that were authored or acquired by Mr. Shin. Magic, I want to just note for the— What does that mean? Yes, so— To convey ownership. What do you literally mean? Under Contracts 1, 2, and 3, ownership of the songs in a 50 percent share was conveyed to my client through— You're saying it was conveyed, but they didn't convey it. I'm asking, what do you literally mean? Somebody was supposed to walk over with a piece of paper that said you got 50 percent? What is the thing that you think had to be done that wasn't done in a concrete way, not a metaphorical way? Sure. So the first thing is that instead of minimizing his share or completely hiding his share of authorship in songs, Mr. Shin would have appropriately given himself the correct percentage share in the creation of a song. You give a percentage. I'm talking about physical, tangible actions. Are you saying that there was a document certifying who owns how much that had to be carried from a person to another, that payments of money needed to exchange hands? What is the thing?  Tell me what is the thing that needed to happen that did not happen? Ultimately, payments of money need to change hands. That's two different things, right? The ownership interest, because you can own a song and not get any money for it. Nobody buys the song. Nobody plays the song. Nobody pays any royalties. So I get that, that if there's income derived from a song, you had to share it with somebody. But what is this business about ownership that was not conveyed? Tell me what was to happen? And forgive me for stumbling over this a little bit. At the creation of the song, the correct percentage in the registration needed to be applied for Mr. Shin's role in creating the particular song. So if he wrote the lyrics and somebody else wrote the music, that's a 50% interest. And therefore, what did they do? Who did what to whom? There are registrations that occur. Where? With different musical organizations such as ASCAP. ASCAP, okay. Those registrations need to be accurate in terms of who created the music. And when Mr. Shin started to take large shares of what should have been his authorship in songs and putting them in the name of ghostwriters like Daniel Kim, he started to hide his interest in those songs. And therefore, his true interest could never be… In other words, he did not inform ASCAP and the others. He did not inform… That's what we're talking about. Yes, Your Honor. He did not inform any… That's in the contract that that particular duty that you're talking about now is supposed to occur and it did not occur, registering with ASCAP or whatever organization? Well, I think the expectation was that the registrations would be done truthfully. Right, but I'm asking a more specific question. The contract specifically says – does it include that particular duty? I'm not 100 percent sure that it does standing here without taking time to look through the document, which I don't want to consume the court's time to do. Right, but I guess that just goes to the question that I think Judge Mardini was getting at before, that what's the thing that was done or not done that was a violation, a breach of the contract? So not assigning his correct interest in songs and then not turning those songs over to my client to then turn over to Sony. What do you mean turn over? That's what I'm trying to understand. What does it mean to turn over a song? That must have a concrete, tangible thing. I get it. That may be a great shorthand description of what one does when one – I don't know, fill in the blank. What is the tangible thing one does to, quote, turn over a song? Well, ultimately you do deliver the song on a specific type form of media so that the song can then be evaluated and commercialized. It could be a recording. It could be on a piece of paper. It could be by email, any one of those. That's correct, Your Honor. The contract makes – and Mr. Shin makes a lot out of this notion of delivery. When delivery is set forth in the contract, it's just the ministerial task of conveying the song on a piece of media. The 50 percent ownership interest is something that was and remains enforceable by my client because the contract made clear that that was the interest he was acquiring. Could you just make sure – isn't there a distinction temporarily to be made – I think the pivotal date is January 1, 2014, when the third agreement modified the second agreement by requiring Shin to deliver compositions to the Reid defendants? It required him to deliver compositions to both my client and the Reid defendants, correct. Both? Yes, and they were to be jointly and severally liable for delivering media. Where does it say that? Just give me a point in the record that says as of the third agreement. I get how it said deliver to the Reid defendant. But where does it say and thou shalt deliver to your client? On appendix page A-73. A-73. Let me pull that up. Okay. – shall be jointly and severally liable for the performance of all obligations to publisher under the agreement, including without limitation all obligations relating to the compositions, delivery thereof, and fulfillment – Remind me. Who's publisher? The defined term publisher right here. In this case, it's Sony Reid EMI. So they're liable for the performance to Sony Reid EMI? Correct, Your Honor. Why does that mean that they have to deliver them to your client? I guess I'm just not following that. Just walk me through that again. And, Your Honor, I see that I'm out of time. I request permission to answer. Yeah, go ahead and answer the question. Okay, thank you. There were questions about the transfer of compositions as between Mr. Shin and Mr. Hamilton on one end and Reid EMI Sony on the publishing end. And instead of making the delivery obligation to be only from Mr. Shin and Mr. Hamilton to my client, Magic, this modification, Contract 3, made them also obligated to deliver compositions to Reid EMI Sony. So as a result, both Mr. Shin and Mr. Hamilton and my client were responsible for delivering songs to Reid EMI Sony. Okay. All right, why don't we hear from your adversary? Thank you very much. May it please the Court, William Hochberg for the defendant, Hyuk Shin, and William Jumbas, defendants. Would you mind, I know that you probably have something you were going to leave with, but could you pick up with the last point we ended with on A73? If the question is, after the third agreement, who was obligated by the contract at that point as modified as of January 1st of 2014 to deliver compositions, from whom to whom? Can you just clarify your understanding of the meeting and direct us to the specific paragraphs? Right, so it's our understanding that the Contract 3 are we talking about now or Contract 2? I'm talking about Contract 3, at least. Contract 3, the obligation is for Shin to deliver the songs to Sony. We're calling it Sony, Reid EMI Sony. Collectively. Collectively. And for Sony to then pay Shin his share and Reid, and rather Magic, his share. So would you just point us to the contractual language your opposing counsel has suggested, directed us to paragraph 2 on A73, suggesting that it means it should be read to require delivery as well to his client. But you're saying it does not require delivery to his client at this point, right? Yeah, I don't see the language that requires – excuse me? Just help us map this out. Yeah, I don't see the requirement to deliver to Magic. I will say that the – what's called the writer's inducement in Contract 2 – well, this – I may not have to – Contract 2, this may be off point. I don't want to wander off your question. Yeah, let's just stick with the narrow point, and then you can wander afield as much as you like. But just help us out. After Contract 3 is signed, I have been laboring under the impression or perhaps misimpression that the delivery obligation was only – for the compositions was only to – well, what I was thinking it was Reid with those three collective parties. And if I may ask – Your opponent says no, no, no, everybody gets it now. So he is looking at A773. Yeah, that's what he directed us to. Obligations to publisher. There's obligations to publishers. I don't see anything here about a delivery requirement to Magic. Well, I'm not saying what you do see or don't see. I'm saying tell us where we find the delivery requirements. Okay, so the delivery – Tell us the language that tells us who delivers to whom. Yeah, I – there's – the definitions are imported from Contract 2 into here, and there's a delivery definition in Contract 2. No, I've been practicing in the music area as a litigator and as a transactional attorney for over 30 years, so I'm sort of familiar with the language here. You know, it's interesting you say that. Part of the problem here is you and your adversaries are experts. We can practically wink at each other and know what the other one is saying. We're not, and we have to be led by the hand. So I would look, Your Honor, at the delivery definition in Contracts 2 and Contracts 3 because after all – Yeah, just tell us where. That's what I'm asking. Yeah, sure. Point is the paragraph. Don't talk in the abstract. Yeah. Because you guys know the details and the devil's in the details here. This is a contract case.  So point is to the paragraphs that say who has a responsibility to deliver what to whom. Sure. That's what we want is we want concrete details. If we look in Contract 2, we get the definitions at the definition of delivery is on page appendix 62 right at the top there. That would be paragraph 11B, delivery. Okay, that says what delivery means. Got that. Okay, and where it's delivered to. So you're asking what's the obligation? I thought your argument, your side's argument in part of this case is that once Agreement 3 was entered into, that there was an obligation that required Shin to deliver the compositions to your clients, not to Magic. Am I understanding that argument correctly, or am I not understanding your argument? You know, that is part of our argument. It's not so important, actually, because it does. Let's hypothesize that I think it's important. Okay. I just want to understand if that is an accurate characterization of your argument, that upon the execution of Contract Number 3, any obligations to deliver the compositions shifted entirely to be delivered to your clients and not to Magic. Because if that's not true, I kind of want to know that. Look at page 1, Appendix 72, the first page of Contract 3. At the bottom, 1C, pursuant to the agreement, Magic is obligated to deliver to Publisher. Okay, so he's got to deliver to you guys. No, we're not a party to this contract. Party 2, and I wanted to give the court context in terms of these three contracts. Yeah, yeah, yeah. Contract 2 is between Magic – no, I'm sorry, Contract 3 we're looking at here, excuse me, is between the three of them. So here Magic is obligated to deliver to the Publisher. Which is DMI and Reed. Yes, which would be Reed. Okay. And then Magic has the sole obligation to make any required – oh, no, actually it's saying Hamilton, Shinn, and Publisher each acknowledge as follows this. And then the obligation to Publisher would be Paragraph 2. That Paragraph 2, Obligation to Publisher, I think that's what it is, that the Publisher under the agreement, the obligations to the Publisher under the agreement are solely Magic's obligation for the remainder of the term, that notwithstanding – let me read the sentence. And I'm sorry, I think part of this may be premised on my misunderstanding of that there are two counsel for the FLEs there, and I may have been thinking that you were representing Reed, and I'm just understanding – I'm representing – sorry, I'm representing Shinn and the Junebuss entity. Shinn and Junebuss, okay, so I think I may have been misunderstanding that a little bit, and I apologize for that. So I may have questions for the folks down at the table, and I apologize if I keep saying you're a client. So I think it's Paragraph 2, Your Honor, on Appendix 73, the notwithstanding first sentence, notwithstanding that all of the obligations to Publisher under the agreement are solely Magic's obligation for the remainder of the term, Shinn and Hamilton hereby agree to perform directly for Publisher, Publisher being Sony, collectively EMI, Reed, and Sony. So there you have it. Okay. Well, let me ask you this then, since you've got Junebuss, and I apologize for all this. Isn't there evidence in the record that Shinn was executive producer for certain Junebuss companies? There is evidence of that, Your Honor, and I'd like to point out that it doesn't take an attorney with 30 years plus experience in the music industry to know that these agreements are music publishing agreements. They're not employment agreements. They're not executive employment agreements. Many times, for example, L.A. Reed himself is a well-known producer and songwriter, and he also happens to be the founder and CEO of a company. So there's nothing in the Contract 1 between Magic and Shinn that – which, by the way, Magic didn't pay Shinn anything other than to agree to pay him half of the money from the songs that Shinn writes. It's not an employment agreement. I'm sorry I'm keeping you up. With respect to Shinn and the Junebuss companies, I thought the key question is whether the Junebuss, construing all evidence in the light most favorable to the non-moving party, the question is whether Shinn and Junebuss are affiliates, right? And it's somebody – an affiliate is defined as somebody in which you own or in which you have an interest, hold or impart, or which employer employs you. And I hear you saying anybody who knows the industry knows executive producers are not employees. I don't know that courts know that. And – or any individual or entity, the operation of which is controlled directly or directly by you. So I guess I would ask you why there is not a genuine dispute of material fact as to whether Shinn and Junebuss were affiliates within the terms of that definition I read. I think Judge Gardefee did a very thorough and thoughtful analysis of the record and rendered a well-reasoned opinion regarding this issue about affiliates. And again, the idea that he's now bound to Magic – Shinn, that is, is bound to Magic to any – for example, songwriters that he might sign to any company. I'm just asking whether he – how and if there's any evidence that he and Junebuss are affiliates under the definition I just read. That's my narrow question. I thought that he testified that in 2013 he was acting as CEO on behalf of the Junebuss USA entity. Well, he may well have – he said that. Okay, so wouldn't that be evidence, for example, that he controls directly or indirectly Junebuss USA entity? Not by any – not necessarily. I mean, he could be acting – It doesn't have to be necessarily. No, as an executive. Remember, we're at summary judgment. So is there a reasonable factual inference that could be drawn by a fact finder that if somebody says, I'm the CEO of that entity, a fact finder might be entitled to conclude that he controlled something? No, because this is a – What do CEOs do if not control things? This is a music – these are music publishing contracts that we're talking about having to do with – between a writer and a publisher for songwriting. They don't have anything to do with being an executive. There's nothing in there about – No, I'm asking the definition of affiliates. If he were working with another company or if he had another company or he was an affiliate, you call it an affiliate, and he was doing something unrelated to songwriting, I think that is clearly not subject to this contract on his face. It's a songwriting contract. It's a music publishing contract, and it has nothing to do with his activities as an executive or as a producer, nothing to do with that. Okay. Why don't we hear from the next counselor, Mr. Maeda? And hopefully you heard some of the questions that I was probably mistakenly directing to Mr. Hoffberg, and I apologize for confusing who was representing whom. Thank you very much, Your Honor. Thank you. Well, Mr. Maeda, maybe since you probably heard some of my misguided questions – and again, I apologize, Mr. Hoffberg, for directing them to you. Maybe you can answer the question about – Absolutely, yes. So I think – – H.L. 73 and who, in your view, has the contractual obligation – So I think it would be helpful if I just give you some context on the contracts and give you our response to that question that you thought was directed to me. So under the original contractual relationship – we're talking about Contract 2 here – there was a chain. You can envision it like a chain where Shin would write a composition, deliver it to Katala Appellant. Appellant would deliver it to my clients, the Reed Appellees. They would administer those compositions. They would get them exploited, collect monies from those compositions, keep their administration fee, give the leftover monies to Appellant. Appellant would keep its share, give the leftover monies to Shin. So compositions would flow up, monies would flow down. After about four or five years, a dispute arose where Shin claimed that Appellant was not giving Shin his share of the monies after Appellant got its share from my clients. And so it actually resulted in a lawsuit. And the result of that was Contract 3, the 2014 modification, where instead of there being a chain where the compositions were delivered to Appellant and then to my clients, pursuant to Section 2 – and it would be the first sentence – where it says, Shin and Hamilton hereby agree to perform directly to Publisher, to my clients, any and all obligations which relate to the compositions, including delivery thereof. Okay, so that's what I was asking about before.  That your view is in Contract 3, page 73 of the appendix, paragraph 2. Correct. When it says that Shin and Hamilton agree to perform any and all obligations relating to delivery, and it says directly for Publisher, that means that this contract foresees the delivery from Shin and Hamilton directly to the Publisher. Correct. Instead of delivery to the Appellant. That's right. Not in addition to delivery to Appellant. Our reading is instead of. Okay. How does that affect you? What's at stake for your clients in this current litigation? In this current litigation? Well, the only claims against us relate to, at least subject to the appeal, is about the settlement agreement, an argument that the settlement agreement breached some unidentified contract provision, which has never been. So what you're arguing about now, you're arguing because we can't see your argument. I would say we have no dog in this fight. I was just responding to his questions. Which I appreciate. Yeah, but I thought I could clarify some things. I was just looking for the dog. Absolutely. So hopefully that clarified some things. No, that's helpful. And just to take that point home, and then the monies would also, that were collected by my clients, would be distributed directly to Shin and Appellant, you know, removing Appellant from that middle position where, you know, to remove any argument that Appellant wasn't giving Shin the full share. So that's how Contract 3 worked. I will briefly move on to the aspects of the appeal relating to my clients, which is, you know, this argument that the settlement agreement, you know, disadvantaged Appellant in some way. We first, the first theory we refer to as like the hostage theory, basically, that our clients could not take any action with respect to Shin without Appellant's consent or participation. But Appellant has never and cannot identify any contract provision giving it such a right, nor any contract provision even arguably breached by the settlement agreement. And to the extent they claim that they were disadvantaged by the settlement agreement, it went out of its way, the settlement agreement, to make abundantly clear, and this is what the district court held, that it preserves and protects all of Appellant's rights under all of the contracts. I can point you to the first page, which states that the settlement specifically excludes any claims that may belong to or be separately capable of being asserted by Appellant. Section 4.1 provides that all of Appellant's rights under the agreements survive. The releases carve out Appellant. Section 10 makes clear that Appellant is not a party or third-party beneficiary to the contract. So the contract goes out of its way to preserve all of Appellant's rights. And the second theory, which we refer to as Appellant's insurance theory, argues that if Appellant loses its claims against Shin, it should somehow be able to join in EMI's and Reed's settlement funds that were paid to EMI and Reed. Appellant can't point to any contractual obligation providing it such a right to share in the settlement funds. And it's also just to put the, this is my last point, I realize I'm running out of time, but to put the settlement into context, it was the payments made to EMI and Reed were for partial consideration of the release of EMI's and Reed's claims against Shin and for a buyout of only EMI's and Reed's pecuniary interest in the agreements. And we offered Appellant to join in the settlement, which then would have involved a greater payout from Shin to account for Appellant's pecuniary interest in the agreements. And Appellant declined to join into the settlement. And so it's our position that it cannot now join in retroactively just because it might, you know, potentially lose its claims. I understand that what you were just discussing, that's what you're, that's what you have at stake here. It's limited to that part of the relationship. Much of what we're talking about here has nothing, has no impact on your final goal. Correct, Your Honor. Okay, thank you very much. Thank you. Mr. Farsad, you've reserved two minutes for rebuttal. We'll try to keep it tightly to two minutes. If you have any key points you think are worthy of rebuttal. Thank you, Your Honors. I do just want to direct the Court to still on appendix page A73, in that same second paragraph that we've been reviewing, where after I heard my brother counsel indicate that the Sony, Reed, EMI view is that this made Shin obligated to deliver only to Sony, Reed, EMI. The middle sentence that begins further, Shin and Hamilton shall be jointly and severally liable with respect to all representations, warranties, covenants, and other obligations of MAGIC under the agreement, and deemed as additional parties to the agreement, and bound by all relevant terms thereof. The agreement that's referenced on the first page as a capital A agreement is contract two, dated May 1st, 2009. So it is our position that delivery was still owed to MAGIC in addition to the Reed, EMI, Sony parties under paragraph two. Speaking about the breach of contract claim against Sony, Sony's rights were all derivative beginning with contract one of my client's rights. So my client located musical talent, brought that talent to Reed, EMI, Sony to exploit. At the point in time in 2018, after it was already known that Mr. Shin was concealing his interest in songs, Mr. Shin then wound up paying a lump sum to Sony in exchange for Sony releasing Mr. Shin from his obligations under contracts two and three. And- That essentially being a settlement between the two of them. It was structured as a settlement between the two of them, correct. And we are fully aware that the court prefers to uphold settlements. This particular settlement disadvantaged my client by cutting off his revenue stream. I see that I'm out of time, and so I will stop now, unless there are other questions. No, thank you very much. Thank you. We have all your arguments, and we will take the case under advisement. So thank you all very much. Thank you so much. And we do have your briefs. I'm sure that we would all benefit greatly by spending lots more time with you all, but your briefs are very comprehensive, and we have your arguments. So again, thank you very much. Thank you.